Hear ye, hear ye, hear ye, United States Court of Appeals for the 11th Circuit is now open according to law. God bless United States and this honorable court. This is usually the time I say please be seated, but I suspect there's not much point in that this morning. Instead, I'll just say welcome to calendar number 16 of oral argument, ostensibly in Miami, Florida, but as all of y'all know, being done by audio entirely this morning. The 11th Circuit and all of its judges and all of its staff are dedicated to handling our caseload, performing our judicial function in as normal a process as possible and as efficiently and promptly as the circumstances permit, and this audio oral argument is one aspect of that. As for special instructions, I don't have many, except to ask the attorneys to please speak as clearly as possible, and not necessarily as rapidly as possible, in measured tones in case the judges have some questions, we can interrupt and ask them. Also, if the attorneys are arguing multiple issues, it might be good to let us know that in advance, or in any event, to pause at the end of an argument of an issue and see if there are any questions, or perhaps even ask if there are any questions, and leave that to you. The first case will be United States v. Washington, where the appellant is Liz Gallagher. May it please the Court, this is Brandi Brentari-Gallagher on behalf of the appellant, the United States. The United States fully recognizes that the Fourth Amendment generally prohibits a warrantless search of a home, so in this case, we do not dispute that the monitoring of a tracking device within Watkins' home constituted a Fourth Amendment violation. However, not every Fourth Amendment violation requires suppression of evidence. In fact, our case law is very clear that the suppression of evidence has always been our last resort, not our first impulse. The core rationale of the exclusionary rule is to deter police misconduct, and when that mission would not be served, courts recognize that the evidence should not be suppressed because of the high social cost of allowing an obviously guilty person to go unpunished, which is precisely what would happen here. There are three well-established exceptions to the exclusionary rule. Two of those exceptions apply here, inevitable discovery and attenuation. Let's take inevitable discovery first. When evidence inevitably would have been discovered, the public interest in having juries receive all probative evidence of a crime outweighs the deterrent effect of suppressing the evidence. If there is a reasonable probability that the evidence in question would have been discovered by lawful means, then suppression is not warranted. Here, agents had already identified Watkins as the main suspect based on her role as a supervisor in the post office and her extremely nervous reaction when she encountered postal inspectors on the day she took the packages. Because of their suspicions, agents looked up her background information, which included her home address. All three agents who testified at the suppression hearing explained that their most likely next step to find the packages was to go to Watkins' home to talk to her. Under those circumstances, it is inevitable that the evidence would have been discovered. The district court concluded that inevitable discovery could not apply because the agents had not definitively determined that their next step would be a knock and talk at Watkins' home. Ms. Geller, this is Robert. Can I ask a question? Of course. The most likely next step, I know that the magistrate judge included that as part of his reporting recommendation. In the motion to reconsider, the district court judge seemed to suggest that instead that it was a speculative next step. How do we treat that? Is that a finding of fact that we review from clear error by the magistrate judge? Do we instead look to the finding, if it's at all a finding, by the district court judge? How do we review that intent by those three agents that testified? The question that you're asking, of course, is a question that involves analyzing whether or not this strictly falls under an emotion to suppress. Is this considered a question of law or a question of fact, if I understand your honor correctly? Okay. The question of what that next step is would be a question of fact, but it is well supported by the record that the next step itself, all of the agents testified that that is what their next step would have been. What the district court determined, I think, is that the aspect that he said was speculative was what her reaction would have been, not instead what the agents intended to do, if you understand that distinction. I can go into that more, if necessary. We understand the distinction, but the Ms. Watkins would have reacted differently later than she did then, did he? He did not, your honor, no. He was speculating it would be speculative, right? That is true, yes. The doctrine of inevitable discovery applies wherever there is a reasonable probability that the ordinary investigation of leads already in the possession of agents would have resulted in the discovery of evidence, and that standard is certainly met here. The agents already possessed the home address for their main suspect. The record reflects that agents wanted to interview her quickly. There was testimony from Agent Padilla that they would have gone to Watkins' home that very same night because, quote, it would have been exponentially harder to locate the package if they did not act quickly. And if agents had knocked on her door that same night, it is reasonably probable that she would have responded in the same way by immediately acknowledging her responsibility for the boxes. Ms. Gowler, what I was referring to earlier, and this is Robert Luck, on page two of the reconsideration order, the district court writes, it is purely speculative to conclude that the law enforcement officers inevitably would have gone to defendant's residence to conduct a knock and talk when they completed their search unsuccessfully. Is that a finding of fact in the same way that the magistrate judges contrary conclusion that they would likely have gone and done a knock and talk a finding of fact? And if we review that from clear error, how is that clearly erroneous? I'm sorry, this is document 130 that you're referring to, Your Honor? No, it's 132. 132. Okay. He's talking about with the district court, contrary to what the magistrate judge found, said it would be purely speculative to say that they would have gone anyway. I see that now. Thank you, Your Honor. I do think that that would be a finding of fact that would found to be clearly erroneous. But as Judge Karnes pointed out, it's not very well supported with facts from the record that support that. Ms. Gallo, the magistrate judge found to the contrary. Did the magistrate judge not? Yes, that is true. All right. And the magistrate judge had an evidentiary hearing and judged the demeanor of the witnesses that they testified. Did he not? Yes, he did. He found the three agents' testimony to be credible and found as a fact that they would have gone. Yes, he did. And then the district court judge, without having an evidentiary hearing, made a contrary finding. And if it's a contrary finding of fact, he contradicted the credibility determinations of the magistrate judge. Did he not? That is, yes, correct, Your Honor. And our law does not permit that, does it? It does not. Not without having the district court hold its own evidentiary hearing, which did not in this case. Right, so that was, this is Judge Marcus, Ms. Gallo. That was an error of law insofar as the district judge rejected the findings, including credibility findings made by the magistrate judge, and substituted his own Would that not be an error of law? It would, Your Honor, yes. Did he make any other mistakes of law? Not under inevitable discovery, Your Honor. Well, let me just stop you on that point. I'm confused about that. As I understood it, Judge Torrance read it to you. The district judge said in substance that it was purely speculative that the agents would have gone to the defendant's home to question Ms. Watkins, even if the beeper had not gone off. Is that the right standard? I thought that the standard was whether it was purely speculative, but whether there was a reasonable probability the evidence would have been discovered absent the illegality. Your Honor is absolutely correct that the proper standard is a reasonable probability that ordinary investigation of the leads that the police already had in their possession would have resulted in the discovery. So it is correct that to the extent that the district court would have made two errors of law, one in rejecting the credibility findings and reaching a contrary finding without hearing them live, and two in using the purely speculative standard rather than the standard of reasonable probability, do I have that correct? You do, Your Honor, yes. Thank you. Counsel, time has expired. All right. The next argument will be from the appellee, the attorney representing the appellee, Ms. McRae. And Ms. McRae, I believe you know our concerns with your case and the questions we asked Mr. Geller. It might be helpful if you begin there. Yes, Your Honor. This is Caroline McRae, counsel for appellee Ms. Watkins, Chief Judge Karnes. May it please the court. Turning first to inevitable discovery, as the court has requested, and then I will move on to whether or not consent and attenuation would justify reversing the district court. With respect to the questions that the court has asked Ms. Geller, the district court's statements regarding the speculative nature of the government's argument that inevitable discovery would justify not suppressing the evidence in this case was a recognition of the actually the knock and talk which would have arguably led to the discovery of the evidence in this case. But it's actually the knock and talk and the series of events that followed. Because the knock and talk did not actually reveal the presence of the boxes in Ms. Watkins' home or allow for the full recorded statement that occurred in her home. Instead, as the government asserted in its motion for reconsideration on page one, that it had to be the knock and talk followed by the exact same unfolding of events. This chain of events that the government was arguing to the court would have occurred in the same way was both appearing for a knock and talk. Then, as soon as Ms. Watkins was clear from the threshold of her door, law enforcement's immediate entry into her home. That is what Agent Padilla at Doctrine entry 69 on pages 70 and 71 discussed. As soon as Ms. Watkins was clear from the threshold of her home, law enforcement immediately entered her home and was present inside the home for two to five minutes. It also required law enforcement to immediately focus on wanting to see the boxes because they knew that the boxes were present in the home. It also required the boxes to still be present in Ms. Watkins' home. Something that the agents recognized in this investigation, you can see in attachment A to the government's reply brief on pages 36 and 41, that these boxes were not intending to stay at Ms. Watkins' home, but were instead intended to be transferred to another individual. Ms. Watkins would also have to have reacted in the same way, providing this implied consent. Excuse me, counsel. What evidence is there that they were to be transferred to another individual? During the recorded interview that occurred inside Ms. Watkins' home, which the government has attached as attachment A to their reply brief, the conversation at page 36 and 41, that is where the agents are discussing with Ms. Watkins that Mr. James, who ultimately became the co-defendant in this case, was actually supposed to have collected the boxes. This isn't a static situation. When you look at the inevitable discovery cases by this court, where you have at one end dealing with an inevitable discovery and the search of the contents of a car, you have the Johnson case, where law enforcement already had the car seized and was inevitably going to do an inventory search of the vehicle. The contents of the car at that time are static. However, at the other end of the spectrum, you have a case like this case, and that would be the Verdon case, where the boxes were not statically going to remain in the home of Ms. Watkins, but law enforcement descended upon her home while the boxes were still there. That influenced both law enforcement's questioning as well as Ms. Watkins' reaction. That's the issue with why the court had to look at how the facts would have unfolded, because it was not just a knock-and-talk that resulted in the discovery of this evidence. It was the knock-and-talk plus the series of interactions that followed, and the district court's finding that the government's argument below that the exact same thing would have occurred was a rejection of that, not based on the credibility of the witnesses that testified before the magistrate court, because the witnesses did not testify that they would have done a knock-and-talk that night. What they testified is that they each individually believed that would have happened. So the district court did not have to reject the magistrate judge's credibility finding about those individual law enforcement officers' beliefs about what would have happened. What he relied on instead were the uncontested facts that the government witnesses supplied. It was not only Ms. Watkins whose identity and address had been looked up, but also, as Agent Rivera revealed, the carrier for Route 8. This is the individual who actually scanned at least one of the packages as delivered. That individual had been identified by law enforcement, and their home address had also been looked up. The district court was also, I believe, recognizing the fact that Agent Rivera told us that when the trackers began working at 8.30 in the evening, the search would have had to continue for approximately two more hours. So had law enforcement turned up empty-handed at 10.30 at night, the idea that they would have gone then at 11 o'clock at night to Ms. Watkins' home to conduct a knock-and-talk was a speculative belief that the government was asserting, especially since they had not even decided that that is, in fact, what they would do. But Counsel, this is Robert Love. Doesn't that have to reject, though, the exact finding that we were just talking about, that their individual testimony that they would have gone that night because of the urgency of making sure they tracked down that package? I just don't understand how you could say what you just said and that not be a rejection of exactly what the magistrate judge found. Well, I think it was a rejection of what the magistrate judge found, but I don't think that it turned on the credibility of witnesses. I think that it turned on the district court looking at all the facts that were presented to the magistrate judge, relying on his credibility findings, but placing different weight on the facts as they were presented. Well, but the district court couldn't have accepted his credibility finding that the agents were credible when they said they would have gone to the house that night anyway and then said it was purely speculative whether they would have gone to the house anyway. The magistrate judge's credibility findings generally and crediting everything they said meant that he found they would have gone to the house that night. Does it not? That is a question. It didn't sound like one, but it is one. Your Honor, I believe that the distinction that I'm drawing is that the witness testified each individually they believed that would happen, not that that would happen. I mean, a witness's statement that that was going to happen would just be a speculation unless there was in fact a plan for that to have already occurred. And so although each of the witnesses testified that they believed that would be their next step, that was just their own speculation and their own subjective belief that that's what they think would come forward. And so that's why the district court focused on the fact that to take that speculation and determine that they would have done it is an actual speculation by the magistrate in his R&R and it's not based on that. According to the district court's use of the word speculation, everything's speculation. You don't know if they had all gotten together and said, all right, let's go to her house. It's only speculation that they wouldn't have changed their mind on the way. The agents were in the best position to determine what they were going to do next and they testified to what they thought they were going to do next. And the magistrate judge credited that testimony. There's a case, Sears v. Optima of the United States Supreme Court, which also involves a reasonable probability standard. In that case, it was a reasonable probability prejudice standard of ineffective assistance. And the Supreme Court said that merely because you can say a reasonable probability determination is speculative and involves speculation doesn't mean that you can't make it and that you're not required to make it one way or the other. You can't dismiss everything as speculation. And we've said that certainty is an illusion in human affairs, but when we make a determination about what would have happened had something been different, you can't dismiss it as mere speculation. Question, Mark. Your Honor, I just believe that the court was recognizing the fact that the witness's prediction of what would occur is not the sort of demonstrated historical fact that allows courts to determine what likely would have occurred. And again, I think that the issue with how the government is framing the inevitable discovery doctrine is that they are focusing on just whether or not law enforcement would have conducted a knock and talk at Ms. Watkins' residence. And what they are ignoring is the fact that this was not a legal knock and talk in this case. What Agent Padilla testified to was after Ms. Watkins opened the door that as soon as she was no longer in the threshold of her home, he and another officer immediately entered her home in order to go through the entire residence. This is at pages 70 and 71 of his testimony. But counsel, that's not the facts that the magistrate judge ultimately found in this case. And as I read the district court's order, not what it found. It found a voluntary consent with regard to the search. I understand that there was some other testimony, and I understand that you rely on that both in your brief and now in argument. But the facts as found by the district court and the magistrate judge were that she came outside when asked, she was asked an open-ended question, she conceded a knowledge of the box, and then through her conduct gave consent to a search of her home, which ultimately led them to the box and led to her statement she was made. Aren't those the historical facts that we have to credit contrary, unless they're clearly erroneous? I believe that you have to construe the facts in the light most favorable to the party that prevailed below, which in this case would be Ms. Watkins. The district court... Let's stop that right there. We don't have to credit facts that were erroneously found by the district judge, and I say erroneously, if they were inconsistent with credibility found that findings made at a hearing and he didn't have a hearing. Do we? I mean, you're not... Suppose the district judge had come out and said, I'm not crediting those law enforcement officers, here's the facts I found. The principle that you ordinarily construe the facts in the light most favorable to the prevailing party would not apply, would they? That's correct, Your Honor. But what I'm referring to now, Agent Padilla's testimony, was not discussed by the district court, so we do not have a situation here where the district court rejected the credibility findings with respect to Agent Padilla. And in actuality, the magistrate judge credited this testimony by Agent Padilla. Below, before the order on the motion to suppress was entered, the government had not asserted inevitable discovery, and in support... Counsel, counsel, I'm looking at page nine of the district court's order, which is document 113. The court finds, this is the district court, the court finds that the defendant's approached defendant's home and announced their presence. Defendant voluntarily spoke to them and admitted them into her home. She also voluntarily gave her statement. That's the... Aren't those the facts to which we need to construe in the light most favorable to the district court's order and ruling? And don't we take those unless they're clearly erroneous? In other words, even if there's another officer who said something to the contrary. Well, Your Honor, you do construe the lights most favorable to the district court, but the same way that the district court relied on the testimony that was credited by the magistrate court, I believe that this court would do that as well. And the magistrate judge in his R&R specifically found Agent Padilla's testimony to be credible. That testimony, again, said that as soon as Ms. Watkins was clear from the threshold, he and another officer entered. So you can't perhaps the magistrate judge and the district court judge found that that did not... Well, actually, the district court judge found that the consent that Ms. Watkins gave, according to the district court, was not sufficiently attenuated. And so when you look at the facts and the circumstances to support the district court's finding, one of the facts that you can look at is the credible testimony of Agent Padilla that the consent that she allegedly gave only followed officers initially entering her home as soon as she was clear from the threshold of the door, having firearms drawn during that entry, ordering the other occupants out of the home, and when Ms. Watkins attempted to walk back into her home, she was specifically told she could not enter her home. But by definition, that couldn't have been voluntary. Well, I believe that this court should reverse the district court's finding that this was the district court's finding that the consent was not sufficiently attenuated. Because of the government's failure to properly preserve the inevitable discovery doctrine, as well as a failure to present evidence so that the court would actually be able to rely on historical facts rather than speculation about what would have occurred, because of the fact that this was a dynamic situation and it was not just a lawful knock and talk that led to the evidence. I have one final question, Chief Judge Barnes, if I may. Sure, absolutely. Yeah, this is Judge Marcus. Ms. McRae, I want to go back to a question I had asked Ms. Dollar earlier, and that is whether or not the district court made a mistake of law insofar as it never employed the standard we have employed regularly on inevitable discovery, which is the reasonable probability the evidence would have been discovered absent the illegality. The only standard, to the extent it's a standard at all, that the district court seems to have That may be a finding of fact. It may be a statement of law. I'm not quite sure. But as I read the district court's opinion, and then on the motion to reconsider, he never employed what seems to me to have been the appropriate legal standard, reasonable probability the evidence would have been discovered absent the illegality. Did he employ that standard? And if he didn't, wasn't that legal error? I believe that because both parties properly briefed the court on that standard, that we have no reason to believe the court did not apply that standard. And his statements regarding the speculative nature of the government's argument were findings of fact. They were in response to the fact that these issues had not been fully developed in the factual record about whether or not law enforcement truly would have gone that evening, and if they had gone at some point in time, why it is that the course of events, not just their arrival on the door, but the course of events that got them inside Ms. Watkins' home, why that would be, why there would be a reasonable probability that that would have actually led to the discovery of these boxes at that time. Just one final question about the law. Did the district court ever construe the active pursuit requirement broadly, which is what our case law requires? Can we even tell that? Well, Your Honor, again, I believe that the active pursuit requirement was appropriately briefed by the parties, and I believe before the district court, and that, again, what the district court, I think, was recognizing was that it was not just a knock and talk that would have had to be pursued, even though we do not have evidence that that's ultimately what law enforcement would have done in relation to the leads that they had in their possession at that time. Thank you. Thank you, Ms. McGray. Ms. Geller, you have five minutes. Thank you, Your Honors. Again, this is Brandy Geller on behalf of the United States. I just wanted to make a few points in response to Apolli's argument as far as the intent of what the officers were looking for. It's very clear from the record that their goal was to find these boxes wherever they were. She suggested that it was the presence of the box that influenced the defendant's very quick admission of her responsibility for them, and I would invite Your Honors to consider that the record supports that there is evidence in the record to believe that she would have had that same reaction anyway, and that comes from the interaction that she had with postal inspectors earlier that very same day when they bumped into her, and she reacted with such extreme nervousness that the agents described it as if she were going to faint. I do think that that is an indication in the record that the court can look to support that her speedy acceptance of responsibility for the boxes was unrelated to the presence of the boxes being so close to her because when she had that encounter with the officers earlier in the day, she was not holding the boxes at that time. I also would note for the court that the plan that the appellee has spent a lot of time saying that the plan was not definitive, which is the finding that the district court made, but again, this court's precedents make very clear that the plan does not need to be an expressly stated plan. Instead, it just needs to be reasonably likely that the officers would have been able through their ordinary investigation to end up realizing and finding that evidence that ultimately was found. We would rely in all other respects, unless your honors have any questions on our brief as far as attenuation argument as well. Ms. Galler, this is Judge Marcus again. I have one question for you. Assuming arguendo that the district court wrongfully substituted his own finding of facts for the credibility determinations and findings made by the magistrate judge and that he could not do that without holding the hearing himself and hearing those witnesses live, what is the appropriate remedy? Is it to vacate and remand or is it to reverse and remand on the issue of suppression? That is to say, does he get to make that ultimate determination when we clarify the law for him? Or do we make that determination ourselves based on what the magistrate found? I believe that the appropriate remedy in this case would not be to remand because the determination that the district court made were based on the record that it had. There would not be a reason at this point to remand and have a new evidentiary hearing in the district court when it did not determine that that was necessary at the time. In conclusion, the Supreme Court has made very clear in NICS that suppression is, quote, an admittedly drastic and socially costly course. Here, suppression would not serve to deter police misconduct, which remains the core goal of the exclusionary rule. Accordingly, suppression is an unnecessary measure here and we ask this court to rule the evidence admissible because Watkins' consent was sufficiently attenuated from the illegal tracking and the agents inevitably would have gone to her home for a knock and talk regardless of the tracker having alerted its location at her home. Thank you.